## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

```
**************************************************
                                                 *
WILLIAM A. VALLS                                 *
CHRISTINE C. VALLS                               *
                        Plaintiffs               *
                                                 *     Civil Action No.
VS.                                              *     3:16-cv-01310 (VAB)
                                                 *
ALLSTATE INSURANCE COMPANY                       *     November 23, 2016
                        Defendant                *
                                                 *
**************************************************
```

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

NOW COME the plaintiffs, William A. Valls and Christine C. Valls (hereinafter collectively referred to as "the Vallses"), and submit the following Memorandum of Law in Opposition to the defendant, Allstate Insurance Company's (hereinafter "Allstate") Motion to Dismiss.

## INTRODUCTION

This controversy concerns Allstate's failure to indemnify the Vallses for damage to their home covered by one or more policies of homeowner's insurance issued by Allstate and purchased by the Vallses. The Vallses purchased the home at 67 Zeya Drive, Coventry, Connecticut in 1998. First Amended Complaint, Document No. 21, ¶ 4. The home was built in 1994. *Id.* In October of 2015, the Vallses noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home. *Id.* at ¶ 9. The Vallses immediately undertook an investigation of the condition, its cause, and the methods of repair by consulting

ORAL ARGUMENT REQUESTED

with various contractors and engineers in October of 2015. *Id.* at ¶ 10. Upon further inquiry, the Vallses discovered that the form of "pattern cracking" found in their basement walls was caused by the presence of a chemical compound found in certain basement walls constructed with concrete most likely mixed by the J.J. Mottes Company between the late 1980s and early 1990s. *Id.* at ¶ 11-12. This particular chemical compound is found in the aggregate of the concrete and will – with its mixture with the water, sand, and cement necessary to form the concrete – begin to oxidize and expand, breaking the bonds of the concrete internally and reducing the concrete to rubble. *Id.* at ¶ 12. There is no known scientific or engineering method or process effective in reversing the deterioration. *Id.* at ¶ 13. It is only a matter of time until the basement walls of the Vallses' home fall in, which will in turn cause the entire house to fall into the basement. *Id.* at ¶ 15-16.

Having observed these conditions and having learned of the substantial impairment to the structural integrity of their home, the Vallses made a timely claim for coverage to Allstate on March 13, 2016. *Id.* at ¶ 17-18. Allstate denied the Vallses' claim by letter dated August 1, 2016 claiming that the homeowner's policy does not afford coverage for damage caused by the condition affecting the Vallses' basement walls. *Id.* at ¶ 30. However, the insurance policy at issue contains clear language providing coverage for "the entire collapse of a covered building structure; the entire collapse of part of a covered building structure…caused by one or more of the following…b) hidden decay of the building structure…f) defective methods or materials used in construction…." *Id.* at ¶ 31, *citing* Form AP472, p. 15, ¶ 11, attached at Exhibit A.

In the time between submitting their claim for coverage and receiving Allstate's coverage decision, the Vallses commenced suit for declaratory judgment in Tolland Superior Court on July

19, 2016 to preserve their rights under the policy.  Allstate removed this matter to the Federal District Court on August 2, 2016, invoking diversity jurisdiction.  On October 17, 2016, the Vallses filed their First Amended Complaint alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Connecticut Unfair Insurance Practices Act ("CUIPA"), in addition to the claim for declaratory judgment.  Allstate's Motion to Dismiss followed on November 2, 2016.

## ARGUMENT

Allstate seeks to dismiss the Vallses' First Amended Complaint in its entirety.  In doing so, Allstate misapplies both the standards for insurance policy interpretation and the standards for pleading.  First, the terms of the policy appear to provide coverage for the collapse of a building structure or the collapse of part of a building structure, provided that it is caused by an enumerated peril.  *Id.*  That said, the Vallses submit that the policy language asserted by Allstate to exclude their claim is ambiguous and, therefore, must be construed against Allstate and in favor of coverage.  Second, the Vallses suggest that they have pleaded sufficient facts to suggest that Allstate wrongfully denied their claim in bad faith and, therefore, they have set forth a claim for breach of the implied covenant of good faith and fair dealing.  Finally, the Vallses assert that they have adequately pleaded that Allstate was acting pursuant to its general business practice in failing to settle their claim in good faith and, therefore, they have stated a claim for unfair and deceptive practices in violation of CUIPA through the private right of action granted by CUTPA.

## I.     Standard for Ruling on a Motion to Dismiss.

The Federal Rules require only that a plaintiff plead "'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) *citing Conley v. Gibson,* 355 U.S. 41, 47 (1957).  While a complaint must contain enough factual content to state a claim that is plausible on its face, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  This plausibility standard is not a "probability requirement."  *Id.*

While *Twombly* marked a departure from prior pleading standards it did not apply a "heightened pleading standard."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 n. 14 (2007). In particular, a plaintiff may satisfy the plausibility requirement with allegations made "upon information and belief" particularly where facts are within the possession and control of the defendant.  *Artisa Records LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010).  A plaintiff does not need to plead with facts with exquisite detail, but must at least provide enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct complained of. *Van Dorsten v. Provident Life and Accident Ins. Co.,* 554 F.Supp.2d 285, 289 (D. Conn. 2008). Though the Supreme Court has recently advanced a more narrow reading of the pleading rules, it still adheres to the proposition that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007).

## II.    <u>The Vallses have Properly Pleaded a Claim for Declaratory Judgment and Breach of Contract.</u>

The Vallses suggest that they have properly pleaded a claim for declaratory judgment and for breach of contract with respect to the coverage afforded under one or more of the

homeowner's insurance policies issued to them by Allstate.[1]   The homeowner's insurance policies issued by Allstate clearly provide coverage for the collapse of a building structure or any part of a building structure, if that collapse is caused by an enumerated peril.   First Amended Complaint, Document No. 21, ¶ 31; Exhibit A, form AP472, p. 15, ¶ 11.   The Allstate insurance policies do not define the term collapse and, as a result, a "collapse" loss occurs for the purposes of those insurance policies where there has been a substantial impairment to the structural integrity of a building structure or any part of a building structure.   *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246, 252 (1987)(where the Supreme Court of Connecticut, in the absence of a policy definition, provided its definition of the word "collapse").   The Vallses' First Amended Complaint alleges that their basement walls have collapsed due to one (1) of two (2) enumerated perils; hidden decay or defective materials or methods used in the construction of their home. First Amended Complaint, Document No. 21, ¶ 11-12.

There can be no reasonable doubt that the basement walls are part of the covered building structure as the Allstate policies define the term "building structure" as "a structure with walls and a roof."  Exhibit A, Form AP472, p. 3, ¶ 5.  The concrete of these walls has been alleged to have failed to the degree that there has been a "substantial impairment to the structural integrity" of the basement walls and, therefore, that part of the building structure has collapsed.   First Amended Complaint, Document No. 21, ¶ 14; *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246, 252 (1987).   Where all or part of the building has collapsed due to an enumerated cause, coverage of the loss becomes the obligation of the insurer.  Allstate seeks to avoid that obligation by suggesting that the damage suffered to the basement walls of the building structure was not

---

[1] As the claims for declaratory judgment and breach of contract involve the same legal analysis the Vallses will address the two counts simultaneously.

"sudden."  Exhibit A, Form AP472, p. 15, ¶ 11.  This argument ignores accepted principles for interpretation of insurance policy terms.  To the contrary, the Vallses contend that the collapse provision is ambiguous with respect to the term "sudden" in the phrase "sudden and accidental," which ambiguity must be construed against Allstate and in favor of coverage.

A.    **Standard for Insurance Policy Interpretation.**

The standards for construing the terms of an insurance policy in Connecticut are clear. Construction of an insurance policy involves a determination of the parties' intent as expressed by the policy language.  *Conn. Ins. Guar. Ass'n v. Fontaine,* 278 Conn. 779, 784 (2006). However, when performing this analysis, the court must construe the policy terms "as laymen would understand them and not according to the interpretation of sophisticated underwriters." *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009).   In particular, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id.*  Where policy terms are unambiguous those terms are accorded their natural and ordinary meaning.  *Jacaruso v. Lebski*, 118 Conn. App. 216, 233 (2009). However, where a term is susceptible to more than one reading, the term is construed against the insurance company as they drafted the policy terms.  *New London County Mut. Ins. Co. v. Zachem,* 145 Conn. App. 160, 166 (2013).  Ambiguous insurance policy terms are not only construed against the insurance company, they are construed in favor of coverage.  *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Mut. Ass. Co.,* 205 Conn. 246, 249-250 (1987).

**B.     The Provision Requiring Damage to be "Sudden and Accidental" is Ambiguous in the Context of the "Collapse" Coverage Afforded by the Allstate Policies.**

Unlike many companies in Connecticut who have proactively sought to avoid liability for the problems associated with the JJ Mottes concrete, Allstate has not defined the term "collapse" in its insurance policies.  Exhibit A, Form AP472, p. 15, ¶ 11.  As discussed more fully above, a "collapse" occurs under Allstate's policies where there has been a "substantial impairment to the structural integrity" of the building.  *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246, 252 (1987).  Respectfully, the term "sudden," as found in Allstate's policy is inconsistent with the definition of "collapse" that has been supplied by the Connecticut Supreme Court.  Where the term "collapse" is not explicitly defined by the insurance policy – as is the case here – the Connecticut Supreme Court has explicitly rejected the notion that a "collapse" must involve a sudden or catastrophic event.  *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246, 252 (1987).  To the contrary, the Connecticut Supreme Court stated unequivocally that a "collapse" occurs where the structural integrity of the building becomes substantially impaired.  *Id.*  In so defining "collapse," the Connecticut Supreme Court accepted as more persuasive the reasoning of those cases finding that "collapse" should mean "substantial impairment" because requiring an insured to wait for a sudden or catastrophic falling down would be "economically wasteful," to say nothing of the potential for injury or death resulting from such a calamity.  *Id.* at 253 n.2.  The *Beach* Court also based its decision to define "collapse" as "substantial impairment" because waiting a calamitous event would conflict with the insured's duty to mitigate damages.  *Id.* Allstate's attempt to impose the characteristic of suddenness to its collapse provision is so inconsistent with the Connecticut Supreme Court's supplied definition of the term "collapse,"

and the reasoning upon which that court supplied definition was based, that it would render coverage for the substantial impairment of the structural integrity of a building hollow. Therefore, Allstate's proffered interpretation of the "collapse" provision should be rejected.

There is a second layer of inconsistency to Allstate's proffered policy interpretation that emanates not from case law, but from the policy language itself. The purported blanket exclusion for all gradually occurring "collapses" is antithetical to most of the events purportedly covered by the section. In fact, the majority of the specifically enumerated perils covered by the "collapse" provision contemplate damage occurring over a period of time. Exhibit A, Form AP472, p. 15, ¶ 11. For instance, homeowners faced with the JJ Mottes concrete typically look to two (2) of the enumerated "collapse" perils when seeking coverage – hidden decay or defective materials used in construction. Exhibit A, Form AP472, p. 15, ¶ 11. "Decay" is a process which, by definition, occurs over a period of time. *See* Webster's New World College Dictionary, 1997, which defines "decay" as "to lose strength, soundness, health, beauty, prosperity, etc *gradually."* (emphasis added). Similarly, by allowing coverage for a "collapse" due to defective materials used in construction that occurs *after* the completion of such construction, the policy contemplates damage stretching over the useful life of a building. Furthermore, a "collapse" is also covered by the policy if it is the result of hidden vermin or insect damage. Exhibit A, Form AP472, p. 15, ¶ 11. Respectfully, insect and vermin damage, like hidden decay, does not cause either a substantial impairment to the structural integrity of a building, much less a catastrophic falling down of a building, in the short term, but rather, such damage would only impact a structure to the point of collapse gradually over a period of time. As such covered perils for "collapse" are clearly contemplated to be gradual in nature, the policy

interpretation proffered by Allstate seems quite inconsistent with the intent of the coverage provided.

The notion that the term "sudden" renders the "collapse" provision ambiguous has been accepted by at least one (1) other court with the occasion to address this specific issue. *See Kelly v. Balboa Ins. Co.,* 897 F.Supp.2d 1262, 1268 (M.D. Fla. 2012). The *Kelly* court construed the phrase "sudden and accidental" in the context of a collapse provision similar to the one at issue in this motion.[2] *Id.* The Court found that the term "sudden" rendered the provision ambiguous because the enumerated perils of "hidden decay" and "hidden insect or vermin damage" occur over a period of time "by their very nature." *Id.* The Court then found that the inclusion of the term "sudden" in a provision providing coverage for long term perils such as hidden insect damage, rendered the whole provision ambiguous. *Id.* The Court then construed the provision against the insurer to find that a "collapse" need not be "sudden" where it is caused by hidden decay or hidden insect damage. *Id.* The Vallses suggest that this decision is well reasoned and that this Honorable Court should construe the collapse provision against the insurer and in favor of coverage by finding that a collapse caused by those perils that naturally occur gradually need not be "sudden."

These sentiments were also expressed by the Second Circuit Court of Appeals, in construing collapse coverage in general. In *Dalton* the Court rejected the notion that a collapse must involve a "sudden destructive force" as inconsistent with the enumerated collapse perils of hidden decay and hidden insect or vermin damage. *Dalton v. Harleysville Worcester Mut. Ins.*

---

[2] Like Connecticut, Florida has interpreted the term "collapse" to mean a substantial impairment of a structure. *Kelly v. Balboa Ins. Co.,* 897 F.Supp.2d 1262, 1268 (M.D. Fla. 2012) *citing Auto Owners Ins. V. Allen,* 362 So.2d 176, 178 (Fla. 2d DCA 1978).

*Co.,* 557 F.3d 88, 93 (2d Cir. 2009). The Court explained that "[b]y their very nature, hidden decay and hidden insect or vermin damage occur slowly and not as a sudden destructive force." *Id.* Therefore, the Court found that even if a collapse loss may typically require some sudden event, "that is surely not the case where the policy in question defines collapse in a manner which expressly includes conditions that occur only slowly." *Id.*

In contrast, Allstate cites to the *Buell* case, which construed the phrase "sudden and accidental," not in connection with the "collapse" provision in a standard homeowner's insurance policy, but rather, in the context of a pollution exclusion found in a commercial general liability policy. The Vallses suggest that because of the inherent gradual nature of the majority of the enumerated "collapse" perils, the reasoning of *Buell* bears little applicability to the policy language at issue. The *Buell* Court construed the term "sudden and accidental" in the context of an exception to a commercial general liability policies exclusion for bodily injury resulting from pollution. *Buell Indus. Inc. v. Greater New York Mut. Ins. Co.,* 259 Conn. 527 (2002). The policy at issue in the case excluded coverage related to pollution, but did provide limited coverage where the discharge of the pollution was "sudden and accidental." *Id. Buell* was well reasoned in the context of pollution as the damage or event is the same in either event – the discharge of pollution – but that it was only the circumstances of the discharge that affected the issue of coverage. This prompted the Court to find that a temporal element of abruptness was necessary to meet coverage, otherwise the term "sudden" would be superfluous and there would be potential coverage for pollution occurring over a long period. *Id.* at 540-541. We are dealing here with entirely different policy language where the application of a temporal quality would render the coverage provided a sham.

Whereas pollution can occur due to a sudden or a gradual release of pollutants, there is no "sudden" type of decay.  Nor is a collapse caused by defective materials, where that collapse may occur any time after construction, necessarily sudden.  To impose the same temporal quality found in the pollution coverage analysis on the "collapse" provision, with its gradually occurring enumerated perils, would serve only to render coverage under the "collapse" provision a nullity.  Such a construction should not be imposed by the court.  *Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 251, (1998).  To impose such a construction on this insurance policy would serve only to lull the layman into a false sense of security, by believing that "collapse" due to long term perils will be covered when, by the use of inconsistent terminology, Allstate is free, after the claim has been filed, to deny coverage for gradual losses.  The Vallses suggest that any lay insured would rightfully and reasonably believe that terms such as "decay" contemplate gradual damage and that this reasonable expectation should be protected.  *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009).

**C.**     **Allstate's Reliance on *Alexander* and *Nestani* is Misplaced.**

Allstate attempts to bolster its arguments with respect to the term "sudden" by reference to two district court cases involving policies with materially different collapse provisions.  The more salient of the two, due to the fact that it was decided by this Honorable Court, is the case of *Alexander v. General Ins. Co.*[3]  The *Alexander* matter involved policy language so distinct from that in this matter as to render it completely irrelevant to the analysis of the Allstate policies.  The policies at issue in *Alexander* contained an exhaustive definition of the term "collapse," which the Court construed as excluding coverage for the plaintiffs' claim and rendering those

---

[3] The Transcript of the Hearing, in which Judge Underhill ruled from the Bench, is attached to the defendant's Motion at Exhibit A.

policies outside of the rule expressed in *Beach*.   The policy definition of the term "collapse" at

issue in *Alexander* provides:

> "a. With respect to this additional coverage:
> 1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
> 2) A building or any part of a building that is in danger of falling down or caving is not considered to be in a state of collapse.
> 3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
> 4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."
> Exhibit B, Form HOM-7030/EP R2 1/09, p. 10, ¶ 11.

Contrary to Allstate's assertion, it is clear that the policies at issue in *Alexander* contain a

materially different collapse provision from that found in the Allstate's policies at issue in this

matter.

As a result of this materially different policy language, Allstate's analysis of that case is

plainly irrelevant to this matter.  Allstate points to the portions of the *Alexander* decision where

Judge Underhill considered whether the term "caving in" was ambiguous in the context of the

structural failure mechanisms displayed by the plaintiffs' home.  Unlike the policy in *Alexander,*

however, Allstate's policy does not define the term "collapse" and therefore, whether or not a

"caving in" has occurred in this instance is of no consequence.  In fact, the very exchange cited

by Allstate on page 13 of its memorandum is clear that Judge Underhill's opinion in that matter

turned on whether an event occurred that satisfied the collapse definition's requirement of a

falling down or falling in.  As this matter does not involve the collapse definition at issue in

*Alexander* that opinion offers little instruction in this case.  Certainly a falling down of a structural element would be abrupt by its very nature, however, as discussed more fully above, there need not be a falling down under Allstate's policy as collapse occurs where there is a substantial impairment to structural integrity.

Much the same may be said of the *Nestani* matter cited by Allstate in support of its interpretation of the term "sudden."  The policy at issue in *Nestani* also involved a specific definition of collapse that is lacking in the Allstate policy, providing that "[c]ollapse means actually fallen down or into pieces."  *Ass'n of Unit Owners of Nestani v. State Farm Fire and Cas. Co.,* 670 F.Supp.2d 1156, 1162 (D. Or. 2009).  The Vallses suggest that this distinction is material, particularly in reference to the Ninth Circuit's treatment of the matter on appeal.  The Ninth Circuit affirmed the District Court's analysis on the grounds that the conclusion that no collapse had occurred was appropriate given the policy definition of the term.  *Ass'n of Unit Owners of Nestrani-A Grecian Villa v. State Farm Fire and Cas. Co.,* 434 Fed.Appx. 579 (9th Cir. 2011).  The Ninth Circuit agreed with the District Court's determination that no event meeting the definition of "collapse" had occurred and that the state of the insured structure was one of impairment, which was insufficient under that particular collapse provision.  *Id.* Importantly, the Ninth Circuit declined to review the District Court's reasoning as to the term sudden as it was able to affirm the decision solely interpretation of the collapse definition.  As a result, the Vallses suggest that this matter is distinguishable and uninstructive.

In contrast to *Alexander* and *Nestani,* the Allstate policies do not define the term "collapse" rendering much, if not all, of the reasoning in those matters plainly inapplicable.  Allstate makes reference to additional limiting language in its collapse provision, perhaps to

suggest that *Beach* should not apply to its policies.   However, the notion that this slight difference in the policy language contained in the Allstate policy is so markedly different that *Beach* does not apply or should otherwise be revisited has also been rejected by this Honorable Court in *Bacewicz*.   The policy in *Bacewicz* contained a similar collapse provision to that found in the Allstate policies, which provision also contains the language stating "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion."   Exhibit A, Form AP472, p. 15, ¶ 11; *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, *6 (D. Conn. 2010).   This Honorable Court properly applied the *Beach* standard, even in light of this slightly different policy language, noting that "[l]ike the contract language at issue in the *Beach* case, the Bacewiczes' policy excludes "settling, cracking, shrinking, bulging, or expansion" from its definition of 'collapse.'" *Id.*   This Honorable Court found that even in light of this differing policy language the collapse provision is reasonably susceptible to more than one interpretation.   *Id.*   This Honorable Court suggested that it is not the presence of a crack or a bulge that makes for a "collapse," but rather culmination of a covered peril resulting in a substantial impairment of the structural integrity of the insured building that is treated as a "collapse."   *Id.*   In so finding, this Honorable Court noted that "it is difficult—if not impossible—to imagine any 'collapse' that did not at some point manifest itself in the form of cracks, bulges, or other physical deformities."   *Id.*   Accordingly, the Vallses suggest that this Honorable Court that *Beach* very much applies and that their home has "collapsed" for purposes of the Allstate policies as a substantial impairment to structural integrity of the basement walls has occurred.

**III.    The Vallses Have Properly Pleaded a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

The First Amended Complaint contains factual allegations relating to the dilatory tactics

taken by Allstate – in the unfounded denial of their claim for coverage and by attempting to mislead the Vallses into believing that the claim was uncovered – sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.  Connecticut law clearly provides that a "duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 432 (2004).  By this implied covenant "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of that agreement." *Id.*  The actions of a party to a contract constitute a breach of this implied duty where "the acts by which the defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contact have been taken in bad faith." *Id.*  The concept of bad faith generally implies both actual or constructive fraud, or a design to mislead or deceive another *but also includes a neglect or refusal to fulfill some duty or some contractual relationship, not prompted by an honest mistake as to one's rights or duties.*"  *Bacewicz v. NGM Ins. Co.,* 2009 WL 1929098 (D. Conn. 2009) citing *Habetz v. Condon,* 224, Conn. 231, 237 (1992)(emphasis added).

The Vallses allege that the basement walls of their home have collapsed and that the collapse was caused by an enumerated peril.  First Amended Complaint, Document No. 21, ¶ 11-14.  The Vallses suggest that despite clear coverage, Allstate denied the claim and misled the Vallses into believing that there was no coverage by citing inapplicable policy language, such as the policy exclusions for damage caused by earth movement or contamination.  *Id.* at ¶ 32; Exhibit C.  The Vallses allege that Allstate's conduct does not appear to be prompted by honest mistake, but rather, by an intentional decision to refuse to pay on an ever growing body of

concrete decay claims.  First Amended Complaint, Document No. 21, ¶ 35, 54-57.  The Vallses suggest that the factual allegations concerning Allstate's conduct, viewed in the light most favorable to them, have shown more than a speculative right to relief on the theory of breach of the implied covenant of good faith and fair dealing.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

This Honorable Court has had the opportunity to construe allegations nearly identical to the Vallses' on a number of prior occasions.  In fact, the sufficiency of allegations identical or nearly identical to these have been sustained by this Honorable Court on seven (7) separate occasions.  *Shawn M. Kowalyshyn, et. al. v. Peerless Ins. Co., et al.,* 3:16-cv-00148 (JAM), attached hereto at Exhibit D; *David Mensher, et al. v. Liberty Mut. Fire Ins. Co.,* 3:15-cv-01007 (WWE), attached hereto at Exhibit E; *Stephen A. Metsack, et al. v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, * 8-9 (D. Conn. 2015); *Raymond G. Gabriel, et al v. Liberty Mut. Fire Ins. Co.,* 2015 WL 5684063, * 4-5 (D. Conn. 2015); *Stephen Belz, et al. v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 164-165 (D. Conn. 2014); *Steven Karas, et al. v. Liberty Mut. Ins. Co.,* 33 F.Supp.3d 110, 116-117 (D. Conn. 2014); *Danny Panciera, et al. v. Kemper Independence Ins. Co.,* 2014 WL 1690387, * 3-4 (D. Conn. 2014).  In each of these cases this Honorable Court found allegations that an insurer had raised and referenced inapplicable exclusions in order to mislead their insureds into believing that there was not coverage, were sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

Allstate ignores these prior matters to focus, instead, on the case of *Geung-Ho Kim v. State Farm Fire and Cas. Co.,* 2015 WL 6675532 (D. Conn. 2015).  In *Kim,* this Honorable Court did depart from its prior precedent of upholding similar claims for violation of the implied

covenant of good faith and fair dealing, however, *Kim* is quite distinguishable from this matter. First, the policy at issue in *Kim* did not offer the "collapse" coverage found in the Allstate policy. While it appears that the policies at issue in *Kim* should ultimately cover the concrete decay damage, the lack of a "collapse" provision does gives rise to the potential that other policy exclusions, typically immaterial to the collapse analysis, may facially offer a legitimate basis for denial under the policy.   Whereas, Allstate does offer coverage for the peril of collapse, rendering the vast majority of the exclusions cited in the denial letter inapplicable and, therefore, misleading.   It is particularly telling that of the eighteen (18) policy exclusions and conditions cited in the denial letter, only four (4) of those exclusions and conditions are now offered by Allstate as material to the issue of coverage.   For that reason, the Vallses suggest that this matter is more analogous to the *Kowalyshyn, Mensher, Metsack, Gabriel, Belz, Karas* and *Panciera* cases, than to the *Kim* matter.

Second, the *Kim* matter, though acknowledging that the cited exclusions appeared to be facially valid, found that the denial letter was not misleading as it took great pains to explain why the particular exclusions cited applied, at least in the opinion of the insurer.   By contrast, the Allstate denial letter makes no attempt to explain the factual basis underlying most of the cited exclusions.   While the letter begins with a summary of Allstate's engineering opinion, including the diagnosis of the cause of the cracking, Allstate then cites to numerous exclusions not supported by the opinions of its engineer.   For instance, while the excerpts of the engineering opinion suggest that exposure to water and air are necessary to fuel the reaction, there is nothing in the summary of his opinions suggesting that the damage was caused by earth movement or contamination, as those terms are defined by the policy.

Respectfully, it is this type of conduct that the Vallses, and the plaintiffs cited above, assert to be unfair – the use of the insurer's relative sophistication with respect to complex policy language to justify a coverage denial to its insureds with a barrage of policy citations of varying applicability.   Simply put, the heart of the Vallses' claim is that Allstate, like all other insurers faced with these concrete decay claims, used superior knowledge of the policy and the knowledge that lay insureds are most likely ignorant of case law construing policy language, to mislead the insured into the belief that their claim is not covered and to discourage further pursuit of insurance benefits as fruitless.   Therefore, the Vallses respectfully suggests that they have properly pleaded a claim for breach of the implied covenant of good faith and fair dealing.

**IV.    The Vallses Have Properly Pleaded a Claim for Violation of CUIPA.**

The State of Connecticut prohibits insurance companies from employing unfair and deceptive practices while conducting the business of insurance.   Conn. Gen. Stat. § 38a-815. Among the many acts and practices defined to be "unfair and deceptive" is the failure of an insurance company to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."   Conn. Gen. Stat. § 38a-816(6)(F).   The Vallses have alleged that Allstate has wrongfully denied their claim despite the lack of an applicable policy exclusion.   First Amended Complaint, Document No. 21, ¶ 37, 53-55.   The Vallses further allege that Allstate has instead relied upon policy exclusions plainly inapplicable to their claim for coverage.   *Id.*   Moreover, the Vallses have alleged not only that Allstate relied upon inapplicable policy exclusions, but that they did so to mislead the Vallses into believing that there was no coverage for the damage suffered to their home.   *Id.* at ¶ 53.   The Vallses have further alleged that Allstate has engaged in this conduct as a part of its general

business practice.  *Id.* at ¶ 54-58.  The Vallses suggest that these allegations, read in the light most favorable to them, properly allege that Vallses engaged in conduct proscribed by CUIPA.

This Honorable Court has, again, had the opportunity to construe allegations nearly identical to the Vallses' on a number of prior occasions.  The sufficiency of allegations identical or nearly identical to these have, again, been sustained by this Honorable Court on seven (7) separate occasions.  *Shawn M. Kowalyshyn, et al. v. Peerless Ins. Co., et al.,* 3:16-cv-00148 (JAM), attached hereto at Exhibit C; *David Mensher, et al. v. Liberty Mut. Fire Ins. Co.,* 3:15-cv-01007 (WWE), attached hereto at Exhibit D; *Stephen A. Metsack, et al. v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, * 9-11 (D. Conn. 2015); *Raymond G. Gabriel, et al v. Liberty Mut. Fire Ins. Co.,* 2015 WL 5684063, * 5 (D. Conn. 2015); *Stephen Belz, et al. v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 165-167 (D. Conn. 2014); *Steven Karas, et al. v. Liberty Mut. Ins. Co.,* 33 F.Supp.3d 110, 117 (D. Conn. 2014); *Danny Panciera, et al. v. Kemper Independence Ins. Co.,* 2014 WL 1690387, * 4-5 (D. Conn. 2014).  In particular, two (2) of these prior decisions have stated clearly that citation to inapplicable exclusions in denying coverage supports the notion that an insurer has engaged in conduct proscribed by CUTPA/CUIPA.   *Raymond G. Gabriel, et al v. Liberty Mut. Fire Ins. Co.,* 2015 WL 5684063, * 5 (D. Conn. 2015); *Steven Karas, et al. v. Liberty Mut. Ins. Co.,* 33 F.Supp.3d 110, 117 (D. Conn. 2014).

Allstate attempts to distinguish this matter from the overwhelming number of matters finding similar allegations similar by again suggesting that the *Alexander* analysis applies to this matter and renders the issue of coverage fairly debatable.  As discussed more fully above, the *Alexander* case involved policy language so materially different from that at issue in this matter that it is inapplicable to the analysis of coverage in this matter and should not have been relied

upon by Allstate in any meaningful way.   In any event, the Vallses suggest that as they have properly pleaded a claim for violation of the consumer protection statutes, Allstate's arguments as to whether coverage was fairly debatable are premature.   The *Tucker* matter cited by Allstate for the proposition that liability has to be "substantially certain" is not only distinguishable from this matter in a material way, but also, a closer examination of the cited principle undercuts Allstate's reliance on the matter.

*Tucker* involved a "claims made" policy rather than an "occurrence" policy and involved a claim that was clearly made outside of the policy period at issue and established by a previous judgment.   *Tucker v. American Intern. Group,* 2015 WL 403195 (D. Conn. 2015).   This particular factual record led to the resounding conclusion that liability had not become reasonably clear.   In a footnote, *Tucker* cited to a hornbook opinion that for liability to be reasonably clear for purposes of an unfair insurance practices statute, the existence of liability has to be substantially certain.   *Id.* at *27 n48.   By way of explanation as to when liability is substantially certain, *Tucker* referred to the similar standard found in Massachusetts law for determining whether liability is reasonably clear for the purposes of M.G.L. c. 176D – Massachusetts' iteration of the uniform unfair insurance practices act – which standard was expressed in a Massachusetts Federal District Court case.   *Id. citing Bohn v. Vermont Mut. Ins. Co.,* 922 F.Supp.2d 138, 146-147 (D. Mass. 2013).   Under the standard cited by *Tucker,* liability is reasonably clear "if a reasonable person, with knowledge of the relevant facts and law, would probably have concluded that the insurer was liable to the plaintiff."   *Bohn v. Vermont Mut. Ins. Co.,* 922 F.Supp.2d 138, 146-147 (D. Mass. 2013).   However, under this objective standard employed in Massachusetts, it is up to the "fact finder to determine whether a reasonable person,

with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." *Demeo v. State Farm Mut. Auto Ins. Co.,* 38 Mass. App. Ct. 955, 956-957 (1995). Even under the objective standard cited by *Tucker*, it is up to the jury and judge whether liability became reasonably clear and, as a result, the issue is not appropriate for resolution at the pleading stage. Therefore, the Vallses suggest that they have pleaded a claim for violation of CUTPA/CUIPA that is sufficient to survive a motion to dismiss.

<u>**CONCLUSION**</u>

For the foregoing reasons, the plaintiffs, William A. Vallses and Christine C. Vallses, respectfully request that this Honorable Court deny the defendant, Allstate Insurance Company's, Motion to Dismiss.

> **PLAINTIFFS,**
> **WILLIAM A. VALL and**
> **CHRISTINE C. VALLS**
>
>
> By: *<u>/s/ Jeffrey R. Lindequist, Esq.</u>*
> Jeffrey R. Lindequist, Esq.
> One Monarch Place, Suite 2220
> Springfield, MA 01144
> (413) 736-4101 – *Telephone*
> (413) 736-4582 – *Facsimile*
> mparker@mdparkerlaw.com
> Federal Bar #ct29425

## CERTIFICATE OF SERVICE

I hereby certify that on **November 23, 2016**, a copy of foregoing **Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion to Dismiss** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jeffrey R. Lindequist, Esq.*